# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **VERIZON COMMUNICATIONS INC. and VERIZON SERVICES, CORP.,**<br>    **Plaintiffs,**<br><br>        v.<br><br>**CHRISTOPHER G. PIZZIRANI,**<br>    **Defendant.** | **CIVIL ACTION NO. 06-4645** |

## MEMORANDUM & O R D E R

**Katz, S.J.**                                                            **November 7, 2006**

Plaintiffs Verizon Communications, Inc. and Verizon Services, Inc. (together "Verizon") seek enforcement of a twelve month non-competition restrictive covenant against their former employee, Defendant Christopher Pizzirani.   On October 16, Defendant resigned from his position as Verizon's Vice President - Product Line Management for Broadband to accept a position with Comcast Cable Communications, Inc. ("Comcast").  In response, Verizon filed the instant Motion for Preliminary Injunction.  For the reasons stated below, the court grants Plaintiffs' Motion.

## I.   FINDINGS OF FACT

### A.  Competition Between Verizon and Comcast

As a preliminary matter, the court notes that Verizon and Comcast are two of the nation's leading communication companies.  Both Comcast and Verizon offer telephone service, internet access, cable television, and wireless communication. In addition to offering similar services, there is significant overlap in their service areas.  Verizon's customers are primarily concentrated in New England, the Mid-Atlantic region, Florida, Texas, and California, and Comcast's customers are concentrated in New England, the Mid-Atlantic region, the Upper Midwest, Florida and California.  Thus, Comcast and Verizon are direct competitors, and each others most significant competitors in this region.

### A.   Defendant's Employment History With Verizon

Defendant Christopher Pizzirani began his employment with Verizon in 1990.  During his sixteen years of employment, Defendant advanced steadily through the ranks to become one of Verizon's most senior executives.  In 2003, Defendant was promoted to Executive Director – Broadband Solutions at Verizon. In this position, he had nationwide responsibility for Verizon's broadband products for residential and business customers.  Among his other duties, Defendant was responsible for developing the business case for Verizon's new broadband

2

products, recommending market strategies, pricing new and existing broadband products, developing customer premises equipment (such as modems) for Verizon's broadband services, negotiating prices with Verizon's equipment vendors, and distributing broadband equipment to Verizon's customers.  He was also the executive responsible for the pricing and deployment strategy for Verizon's new fiber-optic FiOS broadband service, and overseeing the design and marketing of the Verizon One device, a device which combines telephone, modem, and wireless router functions.

Notably, both Comcast and Verizon are developing new broadband offerings and both seek to be "first to market" with these offerings.  Verizon is in the process of deploying a fiber optic network, "FiOS," which supports broadband services, including internet access and cable television.  Verizon considers FiOS crucial to its future success.  Because FiOS is not yet fully deployed, and its deployment expands the areas of competition between Verizon and Comcast, Verizon's deployment plans are highly sensitive information.

On February 26, 2006, Verizon promoted Defendant to the position of Vice President – Product Line Management for Broadband.  In that position, Defendant was among Verizon's most senior executives; his responsibilities and compensation put him in the top 0.2 percent of the company's workforce.  At the

time of Defendant's resignation from Verizon, he was receiving compensation and benefits worth approximately $597,000 per year.

### B.      Verizon's  Non-Competition and Confidentiality Agreements

In 2003, Defendant became eligible to participate in Verizon's Long Term Incentive Program.  Through this program, he was entitled to receive both Restricted Stock Units (RSUs) and Performance Stock Units (PSUs).[1]  RSUs and PSUs are units of deferred compensation that an employee may redeem after a vesting period.

In 2005, Verizon revised its Award Agreements to include a non-competition restrictive covenant.  The non-competition covenant stated that for a period of twelve months after the termination of his employment, an employee may not "work for, own, manage, operate, control or participate in the ownership, management, operation, or control of, or provide consulting or advisory services to, any person, partnership, firm, corporation, institution or other entity engaged in Competitive Activities, or any company or person affiliated with such person or entity engaged in Competitive Activities."

> Competitive Activities" are defined as "business activities relating to products or services of the same type as the products or services (1) which are sold (or, pursuant to an existing business plan, will

---

[1] In 2003, Defendant's incentive plan provided stock options instead of RSUs.

be sold) to paying customers of the Company or any Related Company, and (2) for which you have responsibility to plan, develop, manage, market, oversee or perform, or had any such responsibility within your most recent 24 months of employment with the Company or any Related Company.

The agreement further limits the definition of "Competitive Activities" to those activities carried out on behalf of products that were marketed in geographic areas that overlapped with those in which Verizon offered products and services. The Award Agreements also include a non-disclosure agreement; however, there is no dispute about the enforceability of that provision.

In 2005 and 2006, the restrictive covenants were attached as Exhibit A to Verizon's Long Term Incentive Award Agreements. Under the terms of the Award Agreements, in order to receive the benefits, a plan participant had to agree to abide by the relevant restrictive covenants.

In early March of both 2005 and 2006, Defendant received emails from Human Resources advising in bolded language:

> **As you access you award online, it is important that you read and understand the terms and conditions of your Award Agreements. When accepting your award on-line, you acknowledge that you have read both the award agreements and Plan document, including the terms conditions regarding vesting, *restrictive covenants* and the provisions concerning award payouts.**

Using his computer, on March 17, 2005, Defendant clicked on the "I ACKNOWLEDGE" button at the bottom of this email, thus acknowledging that he understood that in accepting the award, he would become bound by the Award

Agreements and its restrictive covenants.  In 2006, Defendant did not click the "I ACKNOWLEDGE" button, prompting the Human Resources department to contact him regarding his failure to so.  In response, Defendant drafted and sent an e-mail to John Arnold of Verizon's Human Resources stating, "John I will read and agree to the terms and conditions of the award agreement and Plan documents."

After certifying that he understood the importance of reading the Award Agreements, Defendant was able to access the Award Agreement online.  Using an online electronic review and acceptance process Defendant expressly accepted these covenants on multiple occasions.  Specifically, on March 24, 2005, Defendant accepted RSU and PSU awards in separate Agreements and confirmed that he had read the associated covenants and agreed to them.  On March 30, 2006, Defendant accepted RSU and PSU awards in separate Agreements and confirmed that he had read the associated covenants and agreed to them.  Finally, on April 28, 2006, Defendant accepted RSU and PSU awards in separate Agreements and confirmed that he had read the associated covenants and agreed to them.

Despite confirming on numerous occasions that he had read and understood the Award Agreements, Defendant asserts that he did not read the contracts prior to electronically signing them.  In fact, he contends that he was completely unaware of the existence of the restrictive covenants until October 2006.

6

### C.    Defendant Seeks and Obtains Employment with Comcast

In April 2005, Defendant learned that Verizon intended to move its headquarters from Conshohoken, Pennsylvania to Basking Ridge, New Jersey and relocate executives from across the country to that location in April 2006.  Defendant considered relocating his family to Basking Ridge, but decided against it for financial and family reasons, even though his decision not to relocate left him with a daily four hour commute (two hours in each direction) from his home.

In late November or December of 2005, Marci Dwyer an independent executive recruiter, contacted Defendant and informed him that Comcast was searching for a vice president in customer service.  Defendant decided to pursue this opportunity, despite his lack of experience in this area.  In December 2005, Defendant participated in two rounds of interviews for the position, including an interview with Mitch Bowling, Senior Vice President and General Manager for Comcast Online.  Although he was not offered the position, Defendant did impress Comcast.

In approximately May 2006, Mr. Bowling decided to hire an executive to assist him with the day-to-day management of Comcast's high speed data services. Remembering Defendant from his earlier interviews, Mr. Bowling sought to interview Defendant for this position.  Ms. Dwyer again contacted Defendant to

inform him that Comcast had another position in which he might be interested. Defendant informed Ms. Dwyer he would only be interested if his compensation would be comparable to his compensation at Verizon.

In mid-July, Ms. Dwyer arranged a meeting between Defendant and Mr. Bowling.  Comcast then decided to make an offer of employment to Defendant at a higher rate of compensation than normally offered for such a position, including a signing bonus of $150,000 to compensate Defendant for his unvested RSUs and PSUs.  On August 17, 2006, Defendant received Comcast's offer to serve as "VP, Product Management – High Speed Data."  Defendant accepted this offer of employment on August 22, 2006.  Before Defendant resigned from Verizon, though, Ms. Dwyer asked Defendant whether he was positive he did not have a non-compete agreement.  Ms. Dwyer had asked Defendant on numerous occasions prior to this occasion whether he had a non-compete agreement, and on each occasion he had told her did not.

This time, however, Defendant contacted Verizon's Human Resources Department to determine whether he had agreed to a non-competition covenant. In response to his inquiry, Human Resources sent him a sample Award Agreement from Verizon Wireless that did contain a non-competition agreement.  Defendant then looked online to determine whether there was a similar document related to his

Award Agreements.  Defendant discovered that the Award Agreements that he signed for 2005 and 2006 did have non-competition covenants.  As soon as he became aware that he had signed a non-competition agreement, he forwarded a copy of the Award Agreements to Ms. Dwyer, Mike Pascale, Comcast's Vice President of Human Resources, and Katherine Malgieri, a member of Mr. Pascale's staff.

Ms. Dwyer advised Defendant that Comcast's attorneys were reviewing the situation.  While awaiting guidance from Comcast about his non-competition covenants and the effect they would have on his offer of employment, Defendant continued unabated in his position continuing to learn and develop Verizon's confidential and proprietary business information.

In response to the non-competition agreement, Comcast decided to modify its offer to Defendant.  On October 5, 2006, Comcast offered Defendant a position as a Vice President in an executive training program, which it created specifically for Mr. Defendant, rather than in the broadband division of Comcast.  The offer letter specified that Mr. Bowling would supervise Defendant in this training program. Defendant proposed line edits to the October 5 letter to confirm the calculation of his bonus.  On October 13, 2006, Comcast sent a new offer letter that addressed Defendant's concerns regarding his bonus.  The new letter provided that Mr. Bowling would act not only as Defendant's supervisor but also as his "mentor" in the program

and his "point of contact" for an "independent research project."  On October 15, 2006, Defendant accepted this offer with Comcast, and the following day informed Verizon of his decision.  Upon hearing Defendant's decision, Verizon asked Defendant to leave the building immediately.

On Tuesday, October 17, Verizon filed its Complaint in this case and Motion for a Temporary Restraining, Order, Expedited Discovery and Preliminary Injunction to enforce Defendant's non-competition agreement.  The parties were able to reach a temporary agreement delaying Defendant's start date and prohibiting any communication with Verizon.  Now before the court is Defendant's Motion for a Preliminary Injunction.

## II.    DISCUSSION

Defendant raises four primary challenges to Defendant's preliminary injunction.  First, Defendant argues that the court should invalidate the non-competition covenants, because Verizon misrepresented the essential terms of the Award Agreement.  Second, Defendant asserts that even if the Award Agreements are valid, the Agreements give an employee the power to revoke his acceptance at any time.  Third, Defendant contends that Verizon cannot demonstrate irreparable harm.  Finally, Defendant maintains that Verizon cannot demonstrate a likelihood of success on the merits because the scope of the non-competition agreement is unreasonable.

10

For the reasons stated below the court disagrees and will grant Plaintiff's Motion for Preliminary Injunction.

**A.    Threshold Determinations**

     **1.    Choice of Law**

As a preliminary matter, the court finds that New York law governs interpretation and enforcement of the Award Agreements.  The Award Agreements state: "The validity, construction, interpretation and effect of the Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of Laws provisions thereof."  Pennsylvania courts give effect to choice of law provisions when the state selected enjoys a substantial relationship to the parties or the transaction and the application of the law is not contrary to the public policy of another state with a stronger interest in the transaction.[2] Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994).  In this case, New York enjoys a substantial connection to the parties as Verizon's headquarters is in New York and the company does business in that state. Additionally, neither side has alleged that the application of New York law would be contrary to the public policy of another state with stronger ties.

_____

[2] A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941).

## 2.   Misrepresentation

Defendant does not contest that he executed the Award Agreements via electronic signature.[3]   Defendant contends, though, that he did not read the Agreements before signing them, because Verizon misrepresented the essential terms of the Award Agreements.  The Court, however, will not invalidate the non-competition covenant on these grounds.

"In New York, the case law provides that parties are bound 'by the contracts they sign whether or not the party has read the contract so long as there is no fraud, duress or some other wrongful act of the other party.'"  Tarulli v. Circuit City Stores, Inc., 333 F.Supp.2d 151, 156 (S.D.N.Y. 2004) (quoting Tuskey v. Volt Information, Civ. No 00-7410, 2001 WL 873204, at *3 (S.D.N.Y. Aug. 3, 2001)); see also State Bank of India v. Star Diamonds, Inc., 901 F.Supp. 177, 179 (S.D.N.Y.1995) (holding that  under New York law, a party who signs a contract is conclusively presumed to know its contents and to assent to them); Guerra v. Astoria Generating Co., L.P. 8 A.D.3d 617, 618, 779 N.Y.S.2d 563, 564 (N.Y.A.D. 2d Dept. 2004)(holding that "a party that signs a document is conclusively bound by its terms absent a valid excuse for having failed to read it").

---

[3] Under New York law, a valid contract is formed by manifestation of assent, including checking a box or clicking a button on a computer screen, as in this case.  See Moore v. Microsoft Corp., 741 N.Y.S.2d 91, 92 (App. Div. 2d Dept. 2002) (holding a valid contract was formed where the user was required to click on a button labeled "I agree").

Defendant argues that the court, nevertheless, should invalidate the Award Agreements because there was fraud in the execution of the agreement. Specifically, Defendant argues that Verizon misrepresented the nature of agreement by failing to provide him with notice that it had revised the Award Agreements to include a non-competition clause to Award Agreements and by omitting any description of the non-competition agreement from summaries of the Award Agreements.

"Fraud in the execution occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a reasonable opportunity to know of its character or essential terms." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 31-32 (2d Cir. 1997) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 163, cmt. a (1981)).

In this case, Defendant had a reasonable opportunity to know the character and essential terms of the Award Agreements. First, Verizon encouraged Defendant to read the agreement. For each Award Agreement, Verizon sent Defendant an email message warning him that, through his acceptance, he would certify that he had read and agreed to be bound by the award agreement and its *restrictive covenants*. Also, in order have the ability to execute the agreement on his computer, Verizon required the Defendant to click on a box on the computer screen to affirm that he had read and understood the document – which he did in each case.

13

Furthermore, Defendant was not under any time pressure to review and sign the document, giving him more than a month to read and electronically sign the agreement.  Although Defendant complains that he was only able to view the agreement in a small box on the computer screen, the evidence presented at the hearing shows that he had the ability to print the document, save the document to his hard drive or to expand the default size of document viewing screen.  The court further notes that Defendant is a sophisticated businessman, who admitted that in the course of his job at Verizon had read, and even marked for revision, numerous vendor contracts.  Defendant also had a personal motivation to read the Award Agreements as they were worth hundreds of thousands of dollars to him

Moreover, the Court finds that given the efforts Verizon took to make sure their employees understood the importance of reading the contract, there is little evidence to suggest Verizon intended to misrepresent the terms of the Award Agreements.[4]  In fact the only party that made direct misrepresentations was Defendant, who certified on numerous occasions to Verizon that he had read and

---

[4]For this reason, the court rejects Defendant's argument the court should not impose equitable relief for Verizon because it has "unclean."  See Bein v. Heath,47 U.S. 228, 247 (1848) (holding that "the equitable powers of this court cannot ever be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage").   In the court's discretion, it finds that Verizon did not, as argued by Defendant, engage in "sleight of hand practice" to restrain its employees.

understood the Award Agreements.  Thus, the court will not invalidate the non-competition covenants on these grounds.

### 3.    Revocation

Defendant further argues that even if a valid contract were formed, the Award Agreements give him the unilateral power to revoke his acceptance of the Agreement at any time for any reason.  Specifically, Paragraph 3 of the Award Agreements states that "[i]f the Participant does not properly accept (or revokes acceptance of) this Agreement the Participant shall not be entitled to [stock units] regardless of the extent to which the vesting requirements in paragraph 5 ("Vesting") are satisfied."  There is no further explanation of the employee's ability to revoke acceptance.

The exact meaning of this language is somewhat ambiguous.  The language does not explicitly give the plan participant the ability to revoke, but rather provides a contingency for what would happen if he did.  Verizon contends that paragraph 3 was designed to give employees the limited right to revoke acceptance of the Award Agreements before the employees' deadline to accept the Award Agreements expires. In contrast, Defendant argues that this language gives the employee the unilateral and unfettered right to withdraw from the Award Agreements, including the restrictive covenants, at any time, even after the vesting requirements of the plan had been

satisfied.[5] Defendant's explanation of the clause is problematic.  A unilateral, unfettered right of withdrawal renders a contract illusory. See Cross v. Frezza, 161 A.D.2d 927, 929, 557 N.Y.S.2d 498, 500 (N.Y.A.D. 3 Dept. 1990) (holding a contingency clause which allowed one party to withdraw from the agreement was subject to an objective standard of reasonableness, because to hold otherwise would render the contract illusory); Quiello v. Reward Network Establishment Servs, Inc. 420 F.Supp.2d 23, 30-31 (D.Conn. 2006) ("Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor...[w]here the apparent assurance of performance is illusory it is not consideration for a return promise."); Boston Rd. Shopping Center v. Teachers Ins. & Annuity Assn. of Am., 13 A.D.2d 106, 108-109, 213 N.Y.S.2d 522, aff'd 11 N.Y.2d 831, 227 N.Y.S.2d 444, 182 N.E.2d 116); cf. McGrath v. Rhode Island Retirement Bd., 88 F.3d 12, 18 (1st Cir. 1996) ("It is generally the case with supposed unilateral contracts that if the offeror expressly reserves the power to revoke the offer until the

---

[5]Although Plaintiff's explanation of language appears reasonable, this explanation of a limited right to revoke appears nowhere in the Agreements.  Moreover, this interpretation, would render superfluous the language in paragraph 3 –  "regardless of the extent to which the vesting requirements in paragraph 5 ("Vesting) are satisfied."  Because the stock units would never vest during the one month period, if there were no right to revoke after the approximately one month period for acceptance then there would be no need to mention vesting requirements.

offeree's performance is complete, then the offer is illusory and cannot give rise to a unilateral contract.").

"Courts will not adopt an interpretation of a contract that would render the benefit bestowed by the contract illusory." <u>Quantum Maintenance Corp. v. Mercy College</u>, 8 Misc.3d 885, 890, 798 N.Y.S.2d 652, 656 (N.Y. Sup. 2005) (internal citations and quotations omitted); <u>see also</u> <u>In re Crystal Apparel, Inc.</u>, 220 B.R. 806, 815 (Bkrtcy. S.D.N.Y. 1998) (noting that "it is hornbook law that a contract is to be construed as meaningful and not illusory").  Therefore, the court will not adopt Defendant's interpretation of this alleged revocation provision.

The court, however, need not decide the exact meaning of paragraph 3. Paragraph 26(f) of the Award Agreements provide that the covenants "shall continue to apply after *any* expiration, termination, or Cancellation of [the] Agreement." (emphasis added).  Through this clear language, the parties unambiguously expressed their intent to have the covenants remain binding even if the underlying agreements were no longer in effect.  Thus, even if Defendant could unilaterally terminate the agreements by revoking acceptance as he contends, he would still have to abide by the terms of the restrictive covenants.

## B.    Preliminary Injunction

Having found that Defendant has executed a valid non-competition

agreement which he does not have the ability to revoke, the court now considers whether to grant Plaintiff's Motion for a Preliminary Injunction.

To succeed on a motion for a preliminary injunction the movant must clearly establish: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.  Lumex, Inc. v. Highsmith, 919 F.Supp. 624, 627 (E.D.N.Y. 1996) (citing Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)

### 1.      Irreparable Harm

"To establish irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)(quotations omitted).

It is well established that irreparable harm is presumed where a trade secret has been misappropriated. Lumex, 919 F.Supp. at 628; see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (holding that "the loss of a trade secret is not measurable in terms of money damages").  Even where there is no evidence that a trade secret has been disclosed, Plaintiff may demonstrate irreparable harm by establishing that trade secrets will be inevitably disclosed. Este Lauder, 430

F. Supp. 2d 158, 174 (S.D.N.Y. 2006)(noting that some New York Courts have held a showing that the Plaintiff competes directly with Defendant's prospective employer and Defendant has highly confidential information, such as marketing strategies, is sufficient to demonstrate inevitable disclosure);  Earthweb, Inc. v. Schlack, 71 F. Supp.2d 299, 309 (S.D.N.Y. 1999) (holding that Plaintiff had not established an "imminent and inevitable risk" of disclosure to warrant a preliminary injunction); Lumex, 919 F. Supp. at 634 (finding Defendant would inevitably disclose trade secrets because Defendant intended to work for a direct competitor of his former employer in a similar capacity to his former job); Business Intelligence Servs., Inc. v. Hudson, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984)(finding that disclosure of trade secrets by a prospective employee who intended to work for a competitor of her former employer "was likely, if not inevitable and  inadvertent").

Here, Plaintiff has demonstrated irreparable harm as Defendant has information entitled to trade secret protection and Defendant intends to work for a direct competitor.  First, Plaintiff has demonstrated Defendant is knowledgeable about highly confidential information that has trade secret protection.  "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] the opportunity to obtain an advantage over competitors who do not know or use it." RESTATEMENT OF TORTS §

757, cmt. b (1931); <u>Softel, Inc. v. Dragon Medical and Scientific Communications,</u>

<u>Inc.</u>, 118 F.3d 955, 968 (2d Cir. 1997)(noting that "New York generally looks to

section 757 of the first Restatement of Torts for its definition of a trade secret").  In

determining whether information is a trade secret, the most important consideration is

whether that information was kept secret. <u>EarthWeb, Inc.</u>, 71 F.Supp.2d at 314 (citing

<u>Lehman v. Dow Jones & Co.</u>, 783 F.2d 285, 298 (2d Cir. 1986)).

   In this case, Verizon has established that Defendant's has knowledge of, and in

fact designed, particularized marketing plans pertaining to Verizon's Broadband

services.  Defendant has inside information about Verizon's network deployment

plans, financial information regarding Verizon's services, including costs and

revenues all of which are entitled to trade secret protection.  <u>See</u> <u>PepsiCo, Inc. v.</u>

<u>Redmond</u>, 54 F.3d 1262, 1270 (7th Cir. 1995) (holding that, although not the typical

case, strategic information regarding price, distribution, and marketing can fall within

the realm of trade secret protection); <u>Lumex</u>, 919 F.Supp. at 629-30 (noting that

information with regard to prototypes of new and future products, including

manufacturing costs and pricing structure, sales training, projected release dates and

projected life span was entitled to trade secret protection).  At the hearing Verizon

entered into evidence several reports by Defendant regarding marketing strategies

that he marked as confidential information.  Comcast would be able to gain an unfair

competitive advantage by obtaining Verizon's confidential business plans, including cost and pricing information, network capabilities and network deployment strategies. Cf. PepsiCo, 54 F.3d at 1270 (noting that certain trade secrets would enable a competitor "to achieve a substantial advantage by knowing exactly how [Plaintiff] will price, distribute, and market its [products] and[be] able to respond strategically).

Moreover, Comcast and Verizon are direct competitors both in terms of the services they offer and the geographic areas they serve.  To the extent Defendant has any involvement in the broadband area at Comcast, he would inevitably disclose Verizon's trade secrets.  See Estee Lauder Cos. Inc. v. Batra, 430 F.Supp.2d 158, 176 (S.D.N.Y. 2006) (holding that because Defendant intended to work for a direct competitor of his former employer it was inevitable that he would disclose trade secrets because "even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any ... work he might engage in"); Lumex, 919 F.Supp. at 632 (finding it to be inevitable that Defendant would disclose his former employer's trade secrets and confidential information almost immediately upon starting work for a competitor, because Defendant was privy to top secret product, business and financial information which he cannot eradicate from his mind).

21

The court finds Comcast's attempt to circumvent the non-competition covenant by assigning Defendant to an ad hoc executive training program will not sufficiently insulate him from areas in which he might disclose trade secrets, in which he was initially offered employment.  In particular, under the terms of the October 13, 2006 letter offering employment, Defendant will report directly to Mr. Bowling, who has primary responsibility for broadband services at Comcast.  As Defendant's mentor, Mr. Bowling will meet regularly with Defendant and will supervise Defendant's participation in an independent research project.  It would strain credulity beyond the breaking point to conclude that in his extensive contact with Mr. Bowling, Mr. Bowling's responsibilities for broadband will not come into discussion, and that Defendant will not consciously or unconsciously share or draw on insights gained from his work as a senior executive at Verizon.[6]

The court is given additional pause by the fact that Defendant has already violated a confidentiality provision in the Award Agreement and the non-disclosure restrictive covenant.  Specifically, Defendant admits that he forwarded a copy of the

_____

[6]     Moreover, Comcast's statements that they do not want Defendant to disclose trade secrets and that they intend to insulate Defendant completely from tasks that could cause Defendant to disclose trade secrets are undercut by its decision to assign Mr. Bowling the role of mentor. Cf. Estee Lauder, 430 F.Supp.2d at 176 (holding that an employee's "stipulation that he will be divorced completely from product development" for a period of time  in his new job is not sufficient to overcome the plaintiff's showing of irreparable injury).

Award Agreement to Ms. Dwyer and employees of Comcast.  This action was in direct contravention of the terms of paragraph 22 of the Award Agreements, which explicitly states that "except to the extent otherwise required by law, Participant shall not disclose, in whole or in part, any of the terms of this Agreement."   Thus, the Defendant admittedly has violated a confidentiality provision contained in the Award Agreement.

Furthermore, in describing his duties in the resume that he provided to Comcast, Defendant specified the percentage by which he improved employee productivity and the budget for customer premise equipment which he managed.  At the hearing, Defendant admitted that the data he supplied in regard to his duties at Verizon are not available to the public.

Moreover, at the hearing, Defendant admitted that after accepting the final offer of employment from Verizon he transferred files, including confidential and proprietary work documents, from his Verizon computer to his personal computer at home.   He contends that he immediately erased the work documents once he transferred them to his personal computer, and that he only copied the "work files" folder to his home computer, because the "work files" folder was contained in his larger "My Documents" folder which contained music, photographs and other personal files.  The Court finds this explanation problematic, as it would not have

23

been difficult for Defendant to remove any folders which contained confidential work information from his My Documents folder prior to copying it.  The revelation that Defendant copied work files onto his home computer after accepting employment with Comcast is made more disturbing by the fact that Defendant's witness statement which he adopted under oath at the hearing asserts that he had "not *copied*, printed or electronically, maintained any Verizon documents or information relating to [his] work at Verizon."  Plaintiff has given the court reason to question his credibility in regards to his claim that he would fastidiously guard Verizon's trade secrets if worked at Comcast.

The court also notes that the Award Agreements expressly provide that "[i]rreparable damage to the Company shall result in the event that the Covenants... are not specifically enforced and that monetary damages will not adequately protect the Company from a breach of these Covenants."  Under New York law, such a provision can "be viewed as an admission . . . that plaintiff will suffer irreparable harm were [the former employee] to breach the contract's non-compete provision." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999); Estee Lauder Companies Inc. v. Batra, 430 F.Supp.2d 158, 174 (S.D.N.Y. 2006); cf. North Atlantic Instruments, Inc. v. Haber,188 F.3d 38, 49 (2d Cir. 1999)(relying in

part on a similar provision in determining that breach of a confidentiality clause would cause irreparable injury to the former employer).

### 2.    Likelihood of Success on the Merits

New York law subjects non-competition covenants to "an overriding limitation of reasonableness." <u>Karpinski v. Ingrasci</u>, 28 N.Y.2d 45, 49, 268 N.E.2d 751, 320 N.Y.S.2d 1 (1971); <u>Estee Lauder Companies Inc. v. Batra</u>, 430 F.Supp.2d 158, 177 (S.D.N.Y. 2006).  "A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 388, 690 N.Y.S.2d 854, 856-857, 712 N.E.2d 1220, 1223-1223 (N.Y. 1999).

### a.    No Greater than Is Required for the Protection of a Legitimate Interest of the Employer

The non-competition is reasonable in duration, geographic scope, and is necessary to prevent the disclosure of Verizon's trade secrets.  The one year duration of Verizon's non-competition covenant is reasonable. "The durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential business information will be competitively valuable. <u>Este Lauder</u>, 430 F. Supp. 2d at 180 (citing <u>Business Intelligence</u>

Services Inc., 580 F. Supp. at 1073).  In this case, Verizon has put forth sufficient evidence to establish that the proprietary and competitively sensitive information that Defendant obtained, considered, and developed at Verizon is likely to remain competitively valuable to Verizon and its competitors for more than a year.

Additionally, on his resume, Defendant highlighted the fact that he was responsible for developing Verizon's five-year strategic plan and led a team "in outlining the long term strategic vision for the [broadband] product line."  The resume also notes that Defendant's responsibilities at Verizon included preparing five-year revenue forecasts for the key areas of Verizon's business.  The types of information known to and developed by Defendant concerning Verizon's broadband business will remain competitively significant through the expiration of Defendant's non-competition covenant in October 2007.  Thus, the one year duration is reasonable.

The geographic scope of the covenant is reasonable as well.  The non-competition covenant is tailored to prevent Defendant from working only for companies that engage in competitive activities in those areas where Verizon has a business presence.  Given that Defendant had company-wide responsibility for Verizon's broadband products, the non-competition covenant's geographic scope is not unreasonable.

Even if a non-competition covenant is reasonable in time and geographic

scope, enforcement will be granted (1) to the extent necessary to prevent an

employee's solicitation or disclosure of trade secrets, (2) to the extent necessary to

prevent an employee's release of confidential information regarding the employer's

customers, or (3) in those cases where the employee's services to employer are

deemed special or unique.  Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir.

1999)

Here, as applied to the facts of this case, the restriction is reasonable and

necessary to prevent the disclosure of Verizon's trade secrets.  As discussed earlier,

the court finds that Defendant will not be able to participate in the training program

mentored by Mr Bowling, the Senior Vice President and General Manager for

Comcast Online, without disclosing trade secrets.  Thus, under the facts of this

case, the non-competition covenant is reasonable.

### b.    Hardship on the Employee

Th non-competition covenant will not impose an undue hardship on

Defendant. Cf. Business Intelligence Services, Inc., 580 F.Supp. at 1070

(considering the lack of evidence that Defendant will be unable to gain

employment for the next year with an organization not in direct competition with

her former employer, which would not be precluded by her contract). At age 39,

Defendant is already a highly compensated employee, whose compensation

27

package his last year at Verizon would have totaled approximately $597,000 had

he stayed.  He has a bachelor's degree in Commerce and Engineering from Drexel

University and an M.B.A. from Villanova.  In fact, Defendant has acknowledged –

both in the award agreements and during his deposition in this case that he

possesses broad-based, marketable skills so that enforcement of the non-

competition covenant will not prevent him from earning a livelihood.  Although,

he may not be able to receive the same level of compensation at another job, that

hardship is insufficient.  Additionally the court notes that Plaintiff's evidence

established that non-competition covenants are common for this industry in this

area.[7]  As such the court concludes that Defendant's absence from this industry for

the term of the non-competition covenant will not significantly impair his ability to

earn a livelihood in the future.

### c.      Not Injurious to the Public

The non-competition covenant in this case is not injurious to the public.

At the hearing Verizon presented  unrebutted expert testimony that  non-competition

covenants such as the one in this case serve an important public-policy function by

encouraging employers to make significant investments in training key employees

---

[7] Verizon provided expert testimony that non-competition agreements are common in technology based industries.  Mr. Bowling also testified that Comcast subjected its top executives to one year non–competition restrictive covenants.

and permitting employers to share confidential information with employees, which encourages the free exchange of ideas among top personnel.  Additionally, any trade secrets disclosed by Defendant could lead to lessened competition in the broadband market.  As Defendant presented little evidence to the contrary, the court holds this restrictive covenant is not injurious to the public.  Having found irreparable harm and a likelihood of success on the merits, the court holds that the covenant is enforceable and therefore prevents Defendant from accepting employment with Comcast.

In the alternative, for the reasons stated above, the court holds that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See Este Lauder, 430 F. Supp. 2d. at 182.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VERIZON COMMUNICATIONS INC. and VERIZON SERVICES, CORP., <br><br> Plaintiffs, <br><br><br> v. <br><br><br> CHRISTOPHER G. PIZZIRANI, <br> Defendant. | CIVIL ACTION NO. 06-4645 |

# O R D E R

**AND NOW,** this 7th day of November, 2006, upon consideration of the

Proposed Findings of Fact and Conclusions of Law filed by the parties in this

action and the argument and additional evidence presented at this court's hearing

of November 6, 2006 on Plaintiff's Motion for Preliminary Injunction, it is hereby

Ordered as follows:

1.      Defendant Christopher G. Pizzirani shall not commence employment

at or perform any work or services for, of for the benefit of, Comcast Corporation

or any of its related companies ("Comcast") at anytime before October 17, 2007;

and

2.     Defendant shall not disclose to or discuss with Comcast, or use for the benefit of Comcast, any information learned by him during the course of his employment with Verizon or any of its related companies.

3.     This injunction shall issue upon Plaintiffs' posting a bond in the amount of $5000.

**BY THE COURT:**

/s/ Marvin Katz

_____

**MARVIN KATZ, S.J.**